TWENTY–THREE COILS OF CORDAGE (UNITED STATES v.). See Case No. 16,-573.

TWENTY–THREE GALLONS OF DISTILLED SPIRITS (UNITED STATES v.). See Case No. 16,574.

TWENTY–TWO PIPES & TEN HOGSHEADS OF WINE (BRITISH CONSUL v.). See Case No. 1,900.

## Case No. 14,285.

### TWIBELL et al. v. The KEYSTONE.

[9 N. J. Leg. Obs. 289; 4 Am. Law J. (N. S.) 103.]

Circuit Court, S. D. New York. 1851.

COLLISION—STEAM AND SAIL VESSELS—RUNNING OUT TACKS—DANGEROUS OBSTACLE.

1. Where a vessel is beating, and a steamboat is coming after or behind her, the former has the right, and it is her duty, to run out her tacks, irrespective of the course of the latter.

2. If a collision takes place, and the steamboat sets up that the sailing vessel did not run out her tack, and thereby caused the collision. the burthen of proving the defence rests upon the steamboat. *Held*, under the circumstances, the steamboat failed in making the necessary proof.

3. Where a wharf presented itself as a dangerous obstacle to a nearer approach to the shore by a vessel beating, and at the same time a collision was apprehended from an approaching and following steamboat. those navigating the beating vessel had the right of exercising ordinary judgment to go about, and throw the responsibility upon the steamboat of keeping clear of their vessel.

[Cited in Whitney v. The Empire State, Case No. 17,586.]

4. The vessel beating was not bound to incur a risk by coming up into the wind, and endeavoring to keep that position until the steamboat had passed.

5. Under the circumstances, the steamboat could, with proper care, having had the other vessel in view a sufficient time, have avoided any collision, and was responsible for the damages.

[Appeal from the district court of the United States for the Southern district of New York.]

[This was a libel by George Twibell and others against the steam tug Keystone for damages occasioned by collision. The district court decreed for the respondents, and the libelants appeal.]

F. B. Cutting and W. Q. Morton, for libelants.

Erastus C. & Charles L. Benedict, for The Keystone.

NELSON, Circuit Justice. The libel states that the sloop Thomas Lynch, with a cargo of eighty tons of coal, left Philadelphia, bound for Brooklyn, 7th November, 1848; that on the 30th of the month, when beating out of the Kills, and near the entrance into the Bay of New York, the wind and the tide against her, she had stood over to the Staten Island shore on her larboard tack, and, having stood in as far as was prudent without going ashore, she went about, and had just filled away on the starboard tack, when the steam tug Keystone, having in tow several barges heavily laden with coal, bound to New York, overhauled the said sloop, and ran into her, one of the barges having struck her about midships, cutting her down to the water, and causing her to fill and sink in about ten minutes. The answer states that on the day mentioned in the libel, the steam tug, bound from New Brunswick to New York, with a heavy tow, was moving against wind and tide down the Kills, after dark, when the sloop Thomas Lynch was observed ahead, beating down the Kills, and then on the larboard tack; that the tug being a little south of the middle of the channel, the sloop crossing her bows, on the same tack, passed her a short distance, starting across the Kills on a long tack, the wind being N. N. E.; that just after the sloop had passed the tug in safety, and when only about three hundred feet ahead, and one hundred feet to the leeward, and, at the time, a considerable distance from the Staten Island shore, and under no necessity of tacking, and but a short distance from the tug, she suddenly went about on her starboard tack, bringing her broadside to the tide, then running a very strong flood, and by the joint force of the wind and tide drifted down upon the tug so rapidly that it was impossible to avoid the collision; and that it was caused by the sudden and unexpected attempt of the sloop again to re-cross close under the bows of the tug, after she had crossed them once in safety, and when there was sufficient room for her to continue on her course without tacking. The question on the case lies within a narrow limit; and some of the facts very material in the determination of it are not in dispute. Both vessels were bound for the New York Bay, and were coming out of the Kills, off the Staten Island shore, with a pretty strong wind and tide ahead. The sloop was ahead of the tug, on her long tack from the Jersey to the Staten Island shore, and was seen by the captain of the tug. half a mile ahead, while she was on that tack. The tug had a heavy tow, and was moving only at the rate of a mile and a half the hour. The captain of the tug first saw the sloop on her long tack, over his starboard bow. As the tug was nearer the Staten Island than the Jersey shore, the sloop must have been pretty well on her way towards Staten Island when first discovered; and then she was half a mile ahead. The sloop having run out her tack and reached the Staten Island shore, off New Brighton, came about, and filled for the other tack, and had just got under way, when she came in contact with the outside tow, on the larboard side of the tug, striking her a little after midships, and cutting her to the water's edge, when she sunk. Now, it is not to be denied, under the circumstances stated, and not in dispute, but that the sloop had a right to keep her course,

and run out her tack, and at the proper place and time to come about and fill for the other tack, and that it was the duty of the tug not to interfere with her, but to take care and avoid her. The captain of the tug was bound to assume the sloop would run out her tack, and then come about, as this was her duty, as well as her right; and the burthen lies upon him to show that the sloop failed in her duty in this respect, and was in fault, by reason of which the collision happened. This burthen has been assumed, and it is asserted that the sloop failed to run out her tack, and came about unexpectedly and suddenly, before she had completed it, and took the hands on board the tug by surprise, and thus produced the collision. The whole case hinges upon this allegation in the answer, and proof in support of it, and depends on the evidence of the master and hand at the helm of the sloop, and the captain and pilot of the tug; the former proving that their vessel was within thirty yards of the wharf at New Brighton before she came about, and the latter that she was from 150 to 200 yards from the shore at the time. None of the other witnesses speak of the fact. The master of the sloop stood at the time on her bow, and had the best opportunity to judge as to the distance, and could not well be mistaken; besides, the fact was a subject of conversation between him and the man at the helm. They were both aware of the danger of the collision, from the proximity of the tug, and her unchecked advance towards them, and of the necessity of all proper measures to avoid it. They exercised their best judgment under the circumstances, the wind and tide being ahead, and somewhat strong, as to the point near the wharf, beyond which it would be unsafe to pass before coming about, and are responsible only for a sound and judicial exercise of it. Nor is there necessarily any discrepancy on this point in the evidence. The captain and pilot of the tug speak of the distance from the shore, not from the wharf, which is the material fact. Proving the distance from the shore, of itself affords no information to aid us in determining the question at issue. To make it at all available for this purpose, the distance of the wharf from the shore should have been given. It might well be that the sloop came about 150 yards from the shore, and still had run her tack as far as permitted by the wharf. The proof, therefore, in my judgment, fails altogether to establish any fault on the part of the sloop in this respect, but the contrary. Again, it is said, the sloop should have luffed up into the wind, and held that position, instead of filling away, until the tug had passed. But this, it is agreed by the experts, would have been a perilous experiment, regard being had to the wind and tide, and that the manoeuvre had to be made in the night. It was a peril to which the tug had no right to expose her, and for which there was no necessity. She was seen on her tack by the captain, some half a mile ahead, his vessel moving at the rate of a mile and a half the hour. With proper attention to his duty, and assuming that the sloop had fulfilled hers, by running out her tack before she came about, there was not the slightest difficulty in avoiding her. It required nothing beyond a proper lookout and competent skill in the navigation of the tug. The captain had perfect control of her. He could have checked her speed, or stopped, at any point within the half mile, when he found her approaching too near the vessel on the tack. This he was bound to do, and no excuse that can be given is admissible, under the circumstances, or can be sanctioned by the court, except the establishment of the fact that the vessel on the tack was guilty of fault, and which occasioned the accident. If she has conformed to the laws of navigation, as was done in this case, as a general rule, the captain of the steamer must so manage his vessel as to avoid her, and, if a collision occurs, he is responsible. The rule is inflexible, and should be sternly adhered to. In my judgment, it subjects the respondents in this case. The decree below must be reversed, and the case referred to the clerk to take proof of the loss and the damage.